******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

JOHN GIROLAMETTI, JR., ET AL. *v.* MICHAEL
HORTON ASSOCIATES, INC.
(SC 20032)
(SC 20033)
(SC 20036)

JOHN GIROLAMETTI, JR., ET AL.
*v.* VP BUILDINGS, INC., ET AL.
(SC 20034)
(SC 20035)

Robinson, C. J., and Palmer, McDonald, D'Auria and Ecker, Js.

*Syllabus*

The plaintiff property owners sought to recover damages from the defendant
contractor and subcontractors for, inter alia, their alleged negligence
in connection with a commercial construction project. Prior to the
commencement of the present actions, the plaintiffs and the general
contractor, R Co., pursuant to a contract between them, entered into
arbitration to resolve various disputes regarding the project, which
resulted in an award in favor of R Co. R Co. and five of the defendant
subcontractors thereafter moved for summary judgment in the plaintiffs'
actions on the basis of res judicata, contending that all of the claims
raised in the underlying actions had been or could have been raised
and resolved during the arbitration between the plaintiffs and R Co.
The trial court granted R Co.'s motion for summary judgment but denied
the defendant subcontractors' motions for summary judgment, conclud-
ing, with respect to the defendant subcontractors, that they were not
parties to the arbitration and were not in privity with R Co. The defendant
subcontractors thereafter appealed from the denial of their summary
judgment motions to the Appellate Court. The Appellate Court reversed
the trial court's denial of the summary judgment motions, concluding
that the defendant subcontractors were in privity with R Co. for purposes
of res judicata and, therefore, that the plaintiffs' claims were barred
because they could have been raised during the arbitration. In so con-
cluding, the Appellate Court adopted a rebuttable presumption that
subcontractors are in privity with a general contractor on a construction
project for purposes of res judicata. On the granting of certification,
the plaintiffs appealed to this court. *Held*:

1. The Appellate Court correctly determined that, when a property owner
and a general contractor enter into binding, unrestricted arbitration to
resolve disputes arising from a construction project, the subcontractors
are presumptively in privity with the general contractor for purposes
of precluding subsequent litigation against the subcontractors concern-
ing the project under the doctrine of res judicata: adopting a rebuttable
presumption of privity under such circumstances, but allowing parties
to contract around it if they so choose, fosters a fair and efficient system
for resolving construction disputes, and the value of arbitration would
be undermined if arbitration awards were not presumptively final as to all
subcontractors, as owners would otherwise be able to bring subsequent
actions against subcontractors in different forums, leading to the ineffi-
cient proliferation of proceedings and potentially inconsistent outcomes;
moreover, there was no merit to the plaintiffs' claim that it would be
unfair to adopt such a presumption because many of the potential
sources of dispute between a property owner and a subcontractor either
cannot be raised and resolved in an arbitration between the property
owner and the general contractor or will not be apparent before the
arbitration has concluded, as the plaintiffs failed to provide legal author-
ity for the proposition that subcontractors typically owe property owners
a duty independent of the general contractor that would provide the
basis for a direct action against the subcontractors or that such claims
could not be raised in arbitration between the owner and general contrac-
tor regardless of whether subcontractors could be compelled to partici-
pate in arbitration, and the record in the present case was devoid of

any indication that the plaintiffs sought and were denied permission to raise such claims in their arbitration with R Co.; furthermore, the plaintiffs could not prevail on their claims that the Appellate Court improperly ignored this court's prior precedent in concluding, on the basis of the defendant subcontractors' contractual relationship with R Co., that they were in privity with R Co., and that a presumption of privity was ill suited for the complexities of the commercial construction industry.

2. The plaintiffs could not prevail on their claim that the presumption of privity should not apply in the present case because the parties did not intend to structure their legal relationships in such a manner, and, accordingly, the Appellate Court correctly concluded that the defendant subcontractors and R Co. were in privity and that the trial court improperly denied the defendant subcontractors' motions for summary judgment on the basis of res judicata: the record indicated that the plaintiffs anticipated, or reasonably should have anticipated, that their arbitration with R Co. would be the proper forum for addressing any claims that they may have had against the defendant subcontractors at that time, as the standard form construction contract that the plaintiffs chose to use provided that the general contractor would be responsible for all of the subcontractors' work and would be answerable to the owner for such work, the contract contained an arbitration clause that allowed for the unrestricted submission of virtually all claims and disputes, and the plaintiffs' conduct throughout the arbitration process indicated an expectation that R Co. could be held accountable for the conduct of its subcontractors; moreover, the arbitrator's finding that the construction contract did not obligate R Co. to perform or to be responsible for all design and engineering aspects of the project did not represent a finding that R Co. and the defendant subcontractors were not in privity with respect to the engineering work on the project, as that finding merely indicated that the plaintiffs had outsourced certain site, plumbing and electrical work and that R Co. was not responsible to the plaintiffs for the work of those contractors.

Argued December 14, 2018—officially released June 25, 2019

*Procedural History*

Action, in the first case, to recover damages from the defendant Michael Horton Associates, Inc., for alleged negligence, brought to the Superior Court in the judicial district of Danbury, where the defendant Michael Horton Associates, Inc., filed apportionment complaints against the defendant Rizzo Corporation et al., and action, in the second case, to recover damages for, inter alia, the defendants' alleged negligence, brought to the Superior Court in the judicial district of Danbury, where the cases were transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, the plaintiffs in the first case filed an amended complaint asserting claims against the defendant Rizzo Corporation et al.; subsequently, in the first case, the court, *Agati, J.*, granted the motion for summary judgment filed by the defendant Rizzo Corporation and denied the motions for summary judgment filed by the defendant Michael Horton Associates, Inc., et al.; thereafter, in the second case, the court, *Agati, J.*, denied the motion for summary judgment filed by the defendant Blue-Scope Buildings North America, Inc., et al.; subsequently, the plaintiffs and the defendant Michael Horton Associates, Inc., et al. in the first case, and the defendant BlueScope Buildings North America, Inc., et al. in the second case, filed separate appeals with the Appellate Court, *Sheldon, Mullins* and *Bishop, Js.*, which affirmed the decision of the trial court granting the motion for summary judgment filed by the defendant Rizzo Corpo-

ration in the first case, reversed the decisions of the trial court denying the motions for summary judgment filed by the defendant Michael Horton Associates, Inc., et al. in the first case, reversed the decision of the trial court denying the motion for summary judgment filed the defendant BlueScope Buildings North America, Inc., et al. in the second case, and remanded both cases with direction to grant those motions for summary judgment, from which the plaintiffs, in both cases, on the granting of certification, appealed. *Affirmed*.

*Brian J. Donnell*, with whom was *Michael G. Caldwell*, for the appellants (plaintiffs in both cases).

*Anita C. Di Gioia*, for the appellee in Docket No. SC 20032 (defendant Domenic Quaraglia Engineering, Inc.).

*Kevin M. Godbout*, with whom, on the brief, was *Alison H. Weinstein*, for the appellee in Docket No. SC 20033 (defendant Michael Horton Associates, Inc.).

*Sean R. Caruthers*, with whom, on the brief, was *Mark A. Milano*, for the appellee in Docket No. SC 20034 (defendant Pat Munger Construction Company, Inc.).

*Curtis L. Brown*, pro hac vice, with whom were *Damian K. Gunningsmith* and, on the brief, *David S. Hardy*, for the appellee in Docket No. SC 20035 (defendant BlueScope Buildings North America, Inc., et al.).

*Deborah Etlinger*, with whom, on the brief, was *Erin E. Canalia*, for the appellee in Docket No. SC 20036 (defendant Lindade Construction, Inc.).

*Louis R. Pepe* and *Douglas M. Poulin* filed a brief for Associated General Contractors of Connecticut as amicus curiae in Docket No. SC 20036.

*Opinion*

D'AURIA, J. This certified appeal poses the question of whether and under what circumstances arbitration of a construction dispute between a property owner and a general contractor is res judicata as to the claims of subcontractors[1] that did not participate in the arbitration. We agree with the Appellate Court that, in the absence of clear evidence of contrary intent by the parties, subcontractors are presumptively in privity with the general contractor on a construction project for purposes of res judicata. Accordingly, we affirm the judgment of the Appellate Court.

I

The relevant factual and procedural history is set forth in full in the decision of the Appellate Court. See *Girolametti* v. *Michael Horton Associates, Inc.*, 173 Conn. App. 630, 636–46, 164 A.3d 731 (2017). We briefly summarize that history as follows.

These five consolidated appeals arise from disputes regarding the construction of an expansion to a Party Depot Store located in Danbury. The plaintiffs are the owners of the store, John Girolametti, Jr., and Cindy Girolametti. The defendant-appellees are five subcontractors on the project: Michael Horton Associates, Inc. (Horton), Domenic Quaraglia Engineering, Inc. (Quaraglia), Lindade Construction, Inc. (Lindade), BlueScope Buildings North America, Inc., and its employee, Steven Oakeson (BlueScope), and Pat Munger Construction Company, Inc. (Munger). Other original defendants, including the general contractor on the project, Rizzo Corporation (Rizzo), and other subcontractors, are not involved in the present appeals.[2]

In 2009, following the completion of the project and Danbury's issuance of a certificate of occupancy, the plaintiffs and Rizzo, pursuant to the contract between them (prime contract), entered arbitration to resolve various disputes regarding the project. Rizzo contended that the plaintiffs owed it further sums beyond the contract price for extra work performed and costs incurred in connection with the project. For their part, the plaintiffs sought to hold Rizzo liable for costs arising from, among other things, Rizzo's alleged failure to complete the project in a timely and proper manner. They claimed, for example, that Rizzo was responsible for multiple construction defects, had failed to provide a pre-engineered structure that complied with the intent of the original design, and had eliminated some important construction elements, jeopardizing the building's load carrying capacity. None of the other defendants was formally a party to the arbitration.

In December, 2010, on the thirty-third day of what would ultimately be a thirty-five day hearing, the plaintiffs decided to no longer participate in the arbitration hearings, despite the urging of the arbitrator that they

proceed to present their damages claims. The arbitrator subsequently issued an award ordering the plaintiffs to pay $508,597 to Rizzo for sums due. Rizzo's subsequent application to confirm the award was granted by the trial court.

With respect to the plaintiffs' claims, the arbitrator found that the plaintiffs made a conscious and informed decision to no longer attend the hearing, and intentionally refused to present any evidence or expert witnesses to explain or justify any alleged damages. From this finding, the arbitrator concluded that either the plaintiffs did not incur any damages or were unable to prove their damages. The arbitrator also rejected the plaintiffs' claims that the second floor of the building remained unoccupied due to construction defects resulting in structural problems. The arbitrator instead concluded that the structure had passed inspection but that Danbury zoning regulations did not permit use of the second floor for any purpose.

The present appeals arise from two lawsuits, one filed during the arbitration proceedings and one filed subsequently, in which the plaintiffs sought to recover from Rizzo and from its subcontractors. At the heart of many of the plaintiffs' claims in these underlying cases are allegations of negligence in connection with the design and construction of the steel joists used to support the second floor of the building. In the actions underlying these appeals, each of the defendants—who were involved in various capacities in the design and construction of the second floor supports—moved for summary judgment against the plaintiffs on the basis of, among other grounds, res judicata. That is, they contended that all of the claims raised in the underlying actions either had been or could have been raised and resolved during the arbitration.

The trial court granted the motion filed by Rizzo but denied the motions for summary judgment filed by the other defendants. The court concluded that the plaintiffs' actions against the subcontractor defendants were not barred by res judicata because those defendants were not parties to the arbitration and were not in privity with Rizzo. Although it is unclear from the court's brief order, its conclusion that the defendants were not in privity with Rizzo appears to be founded on the premise that they could not have been compelled to participate in the arbitration process.

The defendants brought an interlocutory appeal from the court's denial of their motions for summary judgment. See, e.g., *Santorso* v. *Bristol Hospital*, 308 Conn. 338, 346 n.7, 63 A.3d 940 (2013) (interlocutory appeal may be taken from denial of motion for summary judgment based on res judicata or collateral estoppel). The Appellate Court reversed the judgment of the trial court with respect to the res judicata issue as to all of the defendants. That court held that all of the defendants

were in privity with Rizzo for purposes of res judicata and, therefore, that the plaintiffs' claims were barred because they could have been raised during the arbitration. See *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 173 Conn. App. 630. These certified appeals followed.[3] Additional facts will be set forth as appropriate.

## II

"[T]he applicability of res judicata . . . presents a question of law over which we employ plenary review." *Weiss* v. *Weiss*, 297 Conn. 446, 458, 998 A.2d 766 (2010). The Appellate Court accurately set forth the well established legal principles that govern res judicata: "[T]he doctrine of res judicata, or claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action [between the same parties or those in privity with them] on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to *any other admissible matter which might have been offered for that purpose. . . .* The rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal theories might be advanced in support of it. . . . In order for res judicata to apply, four elements must be met: (1) the judgment must have been rendered on the merits by a court of competent jurisdiction; (2) the parties to the prior and subsequent actions must be the same or in privity; (3) there must have been an adequate opportunity to litigate the matter fully; and (4) the same underlying claim must be at issue." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 173 Conn. App. 650. With respect to the first element, a judgment rendered on the merits, the Appellate Court also noted, and the parties do not dispute, that "[a]n arbitration award is accorded the benefits of the doctrine of res judicata in much the same manner as the judgment of a court." (Internal quotation marks omitted.) Id., 649; accord *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 21 n.5, 699 A.2d 964 (1997).

The following principles govern the second element of res judicata, privity, the only element at issue in the present appeal: "Privity is a difficult concept to define precisely. . . . There is no prevailing definition of privity to be followed automatically in every case. It is not a matter of form or rigid labels; rather it is a matter of substance. In determining whether privity exists, we employ an analysis that focuses on the functional relationships of the parties. Privity is not established by the mere fact that persons may be interested in the same question or in proving or disproving the same set of facts. Rather it is, in essence, a shorthand statement for the principle that [preclusion] should be applied only when there exists such an identification in interest

of one person with another as to represent the same legal rights so as to justify preclusion." (Citation omitted.) *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 813–14, 695 A.2d 1010 (1997).

"While it is commonly recognized that privity is difficult to define, the concept exists to ensure that the interests of the party against whom collateral estoppel [or res judicata] is being asserted have been adequately represented . . . . A key consideration in determining the existence of privity is the sharing of the same legal right by the parties allegedly in privity." (Internal quotation marks omitted.) Id., 813.

Consistent with these principles, this court and other courts have found a variety of factors to be relevant to the privity question. These factors include the functional relationships between the parties, how closely their interests are aligned, whether they share the same legal rights, equitable considerations, the parties' reasonable expectations, and whether the policies and rationales that underlie res judicata—achieving finality and repose, promoting judicial economy, and preventing inconsistent judgments—would be served. See id., 812–16; see also *Wayne County Hospital, Inc.* v. *Jakobson*, 567 Fed. Appx. 314, 317 (6th Cir. 2014) (applying Kentucky law); *DKN Holdings, LLC* v. *Faerber*, 61 Cal. 4th 813, 826, 352 P.3d 378, 189 Cal. Rptr. 3d 809 (2015); *Foster* v. *Plock*, 394 P.3d 1119, 1126 (Colo. 2017). "[T]he crowning consideration, [however, is] that the interest of the party to be precluded must have been sufficiently represented in the prior action so that the application of [res judicata] is not inequitable." (Internal quotation marks omitted.) *Wheeler* v. *Beachcroft, LLC*, 320 Conn. 146, 167, 129 A.3d 677 (2016).

### III

Applying these principles to the facts of the present case, the Appellate Court concluded that each of the defendants was in privity with Rizzo for purposes of res judicata. *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 173 Conn. App. 685–86. On appeal, the plaintiffs contend that the Appellate Court improperly applied a presumption—they label it a "safe harbor" rule—that a general contractor is in privity with all of its subcontractors on a construction project, and, therefore, if an owner and a general contractor choose to arbitrate the typical postconstruction disputes at the end of a project, then the outcome of that arbitration will be res judicata as to all subcontractors (assuming that the other elements of res judicata are satisfied). The plaintiffs argue that such a rule conflicts with established Connecticut precedent and also that, for various reasons, adopting such a rule would be both unwise and unfair. Because we agree that a general contractor is presumptively in privity with its subcontractors for purposes of res judicata, and because we perceive no reason to depart from that presumption under the spe-

cific facts and circumstances of the present case, we affirm the judgment of the Appellate Court.

A

1

When applying the law to complex endeavors such as large-scale commercial construction, it often is desirable to adopt default rules, whether in the form of legal presumptions or standardized contracts. See E. Zamir, "The Inverted Hierarchy of Contract Interpretation and Supplementation," 97 Colum. L. Rev. 1710, 1755–56, 1768 (1997); T. Rakoff, Comment, "Social Structure, Legal Structure, and Default Rules: A Comment," 3 S. Cal. Interdisc. L.J. 19, 20, 25–26 (1993). These default rules help to reduce transaction costs, increase efficiencies, and resolve contractual ambiguities. E. Zamir, supra, 1755–56, 1756 n.175. At the same time, to the extent that public policy is not offended, parties retain the flexibility and freedom to contract around default rules to better serve their unique interests and needs.[4] See id., 1769–70; see also I. Ayres & R. Gertner, "Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules," 99 Yale L.J. 87, 87–88 (1989).

The amicus explains why adopting a default presumption of privity between general contractors and subcontractors is an efficient approach that mirrors the choices that reasonable parties would have made had they expressly considered the question at the outset. See I. Ayres & R. Gertner, supra, 99 Yale L.J. 89–92 (default rules should reflect either what these particular parties actually would have chosen or what arrangements most reasonable bargainers would prefer). The amicus notes that the standard form contracts used in the construction industry typically make the general contractor responsible for the work of all subcontractors.[5] They explain that owners as well as contractors benefit from a presumption that all outstanding disputes involving work on a project can be resolved in the context of an owner-general contractor arbitration. Such a rule permits owners to bring and efficiently and finally resolve all of their claims arising from a project in a single forum, without having to pursue individual subcontractors and sub-subcontractors for satisfaction. The amicus also contends that the use and value of arbitration—particularly specialized construction industry arbitration—would be undermined if arbitration awards were not presumptively final as to all subcontractors. This is because owners who fail to prevail in arbitration could bring subsequent actions against various subcontractors in different forums, leading to the inefficient proliferation of proceedings and potentially inconsistent outcomes.

A number of other jurisdictions have adopted the rule advocated by the amicus by applying at least a rebuttable presumption that subcontractors are in priv-

ity with a general contractor for purposes of res judicata. See, e.g., *Columbia Steel Fabricators, Inc.* v. *Ahlstrom Recovery*, 44 F.3d 800, 802 (9th Cir.) (holding that arbitration award for general contractor was res judicata as to subcontractor, which was in privity with general contractor), cert. denied, 516 U.S. 864, 116 S. Ct. 178, 133 L. Ed. 2d 117 (1995); *United States ex rel. Paul* v. *Parsons, Brinkerhoff, Quade & Douglas, Inc.*, 860 F. Supp. 370, 373 (S.D. Tex. 1994) (under Texas law, general contractor is in vicarious liability relationship with its subcontractor for purposes of res judicata), aff'd, 53 F.3d 1282 (5th Cir. 1995), cert. denied, 516 U.S. 1094, 116 S. Ct. 817, 133 L. Ed. 2d 762 (1996); *Chestnut Hill Development Corp.* v. *Otis Elevator Co.*, 739 F. Supp. 692, 698 (D. Mass. 1990) (subcontractor could bind developer with respect to issues litigated between developer and general contractor in prior arbitration); *Associated Construction Co.* v. *Camp, Dresser & McKee, Inc.*, 646 F. Supp. 1574, 1578 (D. Conn. 1986) (applying Connecticut law, subcontractors were deemed to be in privity with general contractor with respect to res judicata effects of prior arbitration between general contractor and city because [1] claims were asserted under project contract and [2] subcontractors had received payment for work from which claims arose); *DKN Holdings, LLC* v. *Faerber*, supra, 61 Cal. 4th 828 ("[d]erivative liability supporting preclusion has been found between . . . a general contractor and subcontractors" [citations omitted]); *E.W. Audet & Sons, Inc.* v. *Fireman's Fund Ins. Co. of Newark, New Jersey*, 635 A.2d 1181, 1187 (R.I. 1994) (subcontractors and prime contractor were in privity for purposes of res judicata); cf. *Kansas City, Missouri ex rel. Lafarge North America, Inc.* v. *Ace Pipe Cleaning, Inc.*, 349 S.W.3d 399, 404–405 n.11 (Mo. App. 2011) (subcontractor is in direct privity of contract with general contractor and law adopts legal fiction that sub-subcontractor also is in privity of contract with general contractor, for purposes of recovery against statutory payment bond); *CDJ Builders Corp.* v. *Hudson Group Construction Corp.*, 67 App. Div. 3d 720, 722, 889 N.Y.S.2d 64 (2009) ("[a]s a general rule, a subcontractor is in privity with the general contractor on a construction project"). At least one Connecticut court also has applied this rule. See *Tierney* v. *Renaud Morin Siding, Inc.*, Superior Court, judicial district of Fairfield, Docket No. CV-08-5014179-S (October 29, 2008) (46 Conn. L. Rptr. 599) (homeowners who had arbitrated dispute with general contractor were precluded from bringing subsequent claim against subcontractor, who was deemed to be in contractual privity with general contractor).

Although this rule primarily has been justified on the theory that subcontractors are in privity of contract with a general contractor, some commentators and other legal authorities also have reasoned that the parties share legal rights because general contractors are

vicariously or derivatively liable for the work of their subcontractors. See 2 Restatement (Second), Judgments § 51, comment (a), pp. 48–49 (1982) (With respect to preclusion, "[m]any relationships between persons result in one of them being vicariously liable for the conduct of another, the primary obligor. Among these relationships are that of . . . principal contractor and sub-contractor to the extent the former is responsible for the conduct of the latter . . . ."); C. Ingwalson et al., "Arbitration and Nonsignatories: Bound or Not Bound?," 6 J. Am. C. Constr. Laws., No. 1 January, 2012, p. 3 (discussing various contract and noncontract theories according to which nonsignatories may be bound to arbitration agreements).

Adopting this default rule, but allowing parties to contract around it if they so choose, creates a system, both efficient and fair, for resolving complex construction disputes of this sort. Absent this sort of clear default rule, a property owner who fails to prevail in arbitration against a general contractor often will be able to relitigate its claims by simply recharacterizing what are essentially contract claims as violations of a subcontractor's allegedly independent, noncontractual duties. Such fact intensive claims will be difficult for courts to resolve on summary judgment, largely defeating the purpose and benefits of the unrestricted arbitration of disputes.[6]

2

The plaintiffs offer several arguments as to why the Appellate Court should not have adopted a default presumption that general contractors and subcontractors are in privity for purposes of res judicata with respect to a postconstruction arbitration in which the subcontractors did not participate. Their primary arguments are that (1) adoption of such a rule would be unfair, (2) any rule that grounds res judicata exclusively in contractual privity and fails to take into account other aspects of the functional relationship between the parties is inconsistent with this court's precedent, and (3) a presumption of privity is inconsistent with the realities of the construction industry. We consider each argument in turn.

The plaintiffs first argue that it would be unfair to adopt a presumption that a general contractor is in privity with all of its subcontractors on a project for purposes of applying res judicata rules in this context. The plaintiffs contend that adopting such a default rule would be unjust because many of the potential sources of dispute between a property owner and a subcontractor either (1) cannot be raised and resolved in an arbitration, participation in which is limited to the owner and the general contractor, or (2) will not be apparent and addressable at the time that the normal postconstruction disputes are arbitrated in the immediate aftermath of a project's completion. The plaintiffs offer, by way of

example, claims involving extended warranties, latent defects, defects fraudulently concealed, and violations of professional and statutory obligations.

The plaintiffs have not provided any legal authority, however, for their assertion that subcontractors typically owe the property owner any independent statutory, professional, or common-law duties that (1) would provide the basis for a direct action against the subcontractor and (2) cannot be raised in the arbitration between the owner and the general contractor. When pressed at oral argument before this court, the plaintiffs' counsel ultimately conceded that an arbitrator would not be barred from entertaining any such claims and holding a general contractor responsible for any such breach, regardless of whether the subcontractors themselves could be compelled to participate in the arbitration. Counsel speculated that, in practice, most arbitrators would be reluctant to pursue such tangentially related matters. The record is devoid of any indication, however, that the plaintiffs in the present case sought and were denied permission to raise claims of that sort in their arbitration with Rizzo. To the contrary, the arbitrator indicated that he would have preferred to be able to focus on the "forest" and address "the entire [p]roject as a whole" but was prevented from doing so by "the personal and juvenile manner" in which the plaintiffs and Rizzo approached the arbitration.

We recognize, of course, that a property owner cannot possibly raise in arbitration claims that have not yet arisen, such as latent defects, refusal to honor an extended warranty or ongoing service commitment, and the like. But for that very reason, such claims would fail to satisfy the third element of res judicata, which is that there must have been an adequate opportunity to litigate the matter fully. Accordingly, an owner would not be barred from raising claims of this sort in a subsequent action, regardless of the existence of privity.

In the present case, we do not understand the plaintiffs to allege that any failure of design or workmanship *manifested* subsequent to the arbitration. Rather, their primary claim is that, in early November, 2010, prior to the conclusion of the arbitration, Rizzo and certain of the defendants became aware of alleged defects in the project design but conspired to fraudulently conceal those defects from the plaintiffs so that they could not be raised in the arbitration. The Appellate Court concluded that any claim arising from that alleged fraud is now barred by General Statutes § 52-420 (b), which provides that a party seeking to vacate an arbitration award on grounds of corruption, fraud, or undue means must do so within a thirty day limitation period. See *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 173 Conn. App. 653; see also *Wu* v. *Chang*, 264 Conn. 307, 312, 823 A.2d 1197 (2003) (after thirty day limitation period prescribed by § 52-420 [b], court loses jurisdic-

tion to entertain claim that arbitration award was obtained by fraud). Because we declined to certify the question of whether the Appellate Court properly applied § 52-420 (b) under the facts of the present case, that question is not before us, and we express no opinion as to whether the fraud exception to res judicata; see *Weiss* v. *Weiss*, supra, 297 Conn. 472; applies in the arbitration context.

We emphasize in this respect that the presumption of privity is merely a default rule. If, as the plaintiffs contend, some property owners are reluctant to agree to arbitrate their disputes with general contractors for fear that they will be barred subsequently from litigating related disputes with their subcontractors, nothing precludes the parties to a construction project from negotiating a contract that carves out certain issues or certain third parties from the scope of arbitration.

The plaintiffs next argue that the Appellate Court improperly ignored controlling authority by concluding, solely on the basis of contractual relationships, that the defendants were in privity with Rizzo. Specifically, the plaintiffs contend that our decision in *Wheeler* v. *Beachcroft, LLC*, supra, 320 Conn. 146, modified the transactional test that governs the privity analysis for purposes of res judicata and that, under *Wheeler*, there can be no privity when the claims at issue are factually distinct from those raised in the prior litigation or arbitration. The plaintiffs' reliance on *Wheeler* is misplaced.

As we explained in *Wheeler*, the question of whether the element of res judicata requiring that the prior adjudication involves the same underlying claim is distinct from the privity element. Id., 156–57. It is true that, under the unique facts and procedural history of *Wheeler*, there was substantial overlap between the privity analysis and the "same claim" element. Id., 165 n.20. *Wheeler* was a real property case, however, in which the plaintiffs held lots distinct from those of the parties with whom they were allegedly in privity. We emphasized that the parties did not share any common ownership interests with respect to each other's lots; there were no common chains of title, no mutual or successive prescriptive easement rights, and there was no privity of estate. Id., 169–70. Accordingly, the only way that the plaintiffs could have been in privity with prior litigants with respect to the claimed prescriptive rights was if their use of the disputed common lawn was so factually similar as to give rise to an identical legal right. Id., 158, 166–68. Thus, although commonality of use might, under different factual circumstances, have been *sufficient* to establish privity, we never suggested in *Wheeler* that factual commonality would have been *necessary* if, say, the parties had been in privity by virtue of contract or shared or successive ownership.

The present case, by contrast, is a contract matter in which a contractual theory of privity is alleged. Inso-

far as there is contractual privity, the question of factual commonality is simply irrelevant to the privity analysis.[7]

Finally, the plaintiffs contend that adopting a presumption of privity would be unwise because construction projects, contracts, and relationships are complicated; subcontractors may have duties to and agreements with owners that are independent of and distinct from the duties that run through the general contractors. The plaintiffs warn that any preclusion rule that fails to account for this reality will sound the death knell of construction arbitration; property owners will be loath to agree to arbitration with their general contractors if doing so risks abandoning whatever independent rights and claims they may have against the subcontractors.

We doubt that a presumption of privity would create a disincentive for property owners to participate in arbitration. As the amicus explains, it is as much to the benefit of owners as it is to subcontractors to be able to expeditiously resolve all disputes arising from a construction project in a single forum. Moreover, the fact that other jurisdictions apply such a rule, and presumably have not encountered the negative experiences invoked by the plaintiffs, reassures us that to do so would not be unwise.

We also are skeptical of the plaintiffs' contention that the rule that the Appellate Court applied is ill suited for the complexities of many present day construction projects, which tend to feature multiple and divergent lines of authority running between a project owner and various contractors and subcontractors. We observe that the plaintiffs and Rizzo arbitrated their dispute pursuant to the construction industry arbitration rules of the American Arbitration Association, and that they selected as their arbitrator Arthur G. Folster, a general contractor and registered professional engineer with more than forty years of experience in contract administration and the design and construction of major building projects worth as much as $500 million. Folster had been trained as a construction industry arbitrator and had arbitrated a wide range of project disputes.

The award of this experienced construction arbitrator suggests that, although this particular project was indeed characterized by multiple, convoluted lines of authority and "complicate[d]" legal relationships, the type of arrangement that the plaintiffs orchestrated here is neither normal nor desirable. Rather, the arbitrator concluded that the administration of the prime contract was "unique," and that the administration and coordination of the project were performed in a "flawed manner . . . ."[8] Accordingly, the fact that a presumption of privity might not dovetail with the realities of this particular project does not count as a general strike against a default presumption of privity.

For these reasons, we conclude that the Appellate Court correctly determined that when a property owner and a general contractor enter into binding, unrestricted arbitration to resolve disputes arising from a construction project, subcontractors are presumptively in privity with the general contractor with respect to the preclusive effects of the arbitration on subsequent litigation arising from the project.

B

Having concluded that the Appellate Court properly adopted a rebuttable presumption that general contractors and subcontractors are in privity for purposes of res judicata, we now consider whether the record supports the plaintiffs' contention that the presumption should not apply in the present case because the parties did not intend to structure their legal relationships in such a manner.[9] We conclude, to the contrary, that the record indicates that the plaintiffs anticipated, or reasonably should have anticipated, that the arbitration between themselves and Rizzo would be the proper forum for addressing any claims that existed against the defendants at that time.

1

The clearest evidence of the parties' intent in this regard is the prime contract. The plaintiffs chose to use a standard form owner-contractor construction contract published by the American Institute of Architects, and so presumably intended that their agreement would be governed by industry norms.

The prime contract includes the following relevant terms: (1) "Nothing contained in the Contract Documents shall create any contractual relationship between the Owner or the Architect and any Subcontractor or Sub-subcontractor"; (2) "[t]he Contractor . . . shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract"; (3) "[t]he Work comprises the completed construction required by the Contract Documents and includes all labor necessary to produce such construction"; (4) "[t]he Contractor shall be responsible to the Owner for the acts and omissions of his employees, Subcontractors and their agents and employees, and other persons performing any of the Work under a contract with the Contractor"; and (5) "[u]nless otherwise provided in the Contract Documents, the Contractor shall provide and pay for all labor . . . and other facilities and services necessary for the proper execution and completion of the Work . . . ." Accordingly, although other provisions of the prime contract reserve to the owner the right to perform work on the project with his own forces and to award separate contracts to other contractors in connection with portions of the project, absent such arrangements, the contract clearly provides that

the general contractor will be responsible for all of the subcontractors' work on the project and will be answerable to the owner therefor.

Indeed, the prime contract requires the contractor to formalize these so-called "flow down" obligations with each subcontractor. Another provision provides: "By an appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these Documents, assumes toward the Owner . . . . Said agreement shall preserve and protect the rights of the Owner . . . under the Contract Documents with respect to the Work to be performed by the Subcontractor so that the subcontracting thereof will not prejudice such rights . . . . Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with his Sub-subcontractors." As noted in the opinion of the Appellate Court, although Rizzo's subcontract with Lindade includes the flow down provision required by the prime contract,[10] the other defendants' subcontracts did not include such provisions. This fact might be relevant to assessing the *defendants'* expectations, but the question before us is whether the *plaintiffs*, in view of the provisions of the *prime* contract, reasonably could have expected that any claims that they had against Rizzo's subcontractors could have been raised against Rizzo in the arbitration. The answer to that question is unequivocally yes.

The arbitration provision contained in the prime contract confirms this conclusion. "When the arbitration agreement is broad . . . and there are no other limits on the scope of the arbitration, courts have applied res judicata based on a broad, transactional view of the arbitrated claim." G. Shell, "Res Judicata and Collateral Estoppel Effects of Commercial Arbitration," 35 UCLA L. Rev. 623, 643 (1988). In the present case, the prime contract includes a standard construction industry arbitration clause that allows the unrestricted submission of all claims and disputes to the arbitrator, with the exception of claims relating to the plaintiffs' project architect. In addition, the arbitration provision envisions and permits the joinder or other participation of third parties who are "substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration." That provision further undercuts the plaintiffs' argument that they could not have sought relief in the arbitration with respect to claims arising from the work of Rizzo's subcontractors. See C. Ingwalson et al., supra, 6 J. Am. C. Constr. Laws., no. 1, p. 3 ("[w]hen a contract providing for arbitration refers to the role to be played by nonsignatories, or when a

pleading in a dispute between signatories refers to conduct of nonsignatories . . . there is an increased likelihood that nonsignatories can be bound by, or claim rights pursuant to, an arbitration clause").

We also think that the plaintiffs' conduct throughout the arbitration process further evidences an expectation that Rizzo could be held accountable for the conduct of its subcontractors, consistent with a finding of privity. See footnote 9 of this opinion. In their prehearing brief to the arbitrator, the plaintiffs contended that "[t]he structural issues on the project for the [p]re-[e]ngineered [b]uilding are Rizzo's and [Horton's] responsibility." During discovery, the plaintiffs requested that Rizzo provide all documents relating to its communications and agreements with its subcontractors. The plaintiffs then issued subpoenas and document requests to Quaraglia, Munger, Oakeson, Lindade, and Horton, among other subcontractors. Although most of the defendants ultimately were not called to testify, a representative of Horton, Douglas H. McCloskey, was called and testified at length over the course of several days of the arbitration hearing. Further, as the Appellate Court emphasized, during the arbitration, the plaintiffs adduced evidence of the alleged failure of several of the defendants to meet their obligations on the project. See *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 173 Conn. App. 672 (Quaraglia); id., 680 (Munger); id., 684 (BlueScope). In addition, while the arbitration was pending, the plaintiffs' structural engineer, Richard J. Marnicki, prepared a report reviewing the building's load bearing capacities. In preparing that report, Marnicki visited the offices of and requested engineering drawings and calculations from several of the defendants. It seems clear, then, that although the defendants never were formally made party to the arbitration, the plaintiffs viewed them as an integral part of the process, saw Rizzo as responsible for their conduct, and were not precluded from involving the defendants in the arbitration in various capacities.

2

In arguing for a contrary conclusion, the plaintiffs contend that the conclusion of the Appellate Court that Rizzo was in privity with all of its subcontractors is inconsistent with the arbitrator's factual findings. In this respect, the plaintiffs rely heavily on the following sentence in the arbitration award: "The [c]ontract, as drafted by [the project architect] and executed by [the plaintiffs], does not obligate [Rizzo] to perform or be responsible for all design and engineering aspects of the [p]roject." The plaintiffs interpret this finding to mean that, regardless of any default presumptions, Rizzo was not in privity with and could not be held responsible for the defendants' engineering work on the project.

The defendants respond, and we agree, that, when read in context, the arbitrator's statement does not represent a finding that Rizzo and its subcontractors were not in privity with respect to engineering work on the project. The paragraph of the award in which the sentence appears begins by noting that the contractual arrangements governing the project were complicated by virtue of the fact that the plaintiffs chose to contract independently with Danbury Septic for site work, with Rieve Plumbing & Mechanical for mechanical design and construction, and with Tucker Electrical for electrical design work, and that those contractors reported directly and exclusively to the plaintiffs. That arrangement was consistent with the prime contract, which permitted the plaintiffs to hire separate contractors and subcontractors to perform portions of the project. Considered in that context, the most reasonable reading of the sentence at issue is that the arbitrator was simply noting that the plaintiffs permissibly outsourced and supervised the referenced site work, and plumbing and electrical work, and, therefore, that Rizzo was not responsible to the plaintiffs for the work of those subcontractors. Our interpretation is supported by the fact that site work represented one of the principal grounds for Rizzo's arbitration claims against the plaintiffs.[11]

To summarize, we find nothing in the record to rebut the presumption that the plaintiffs reasonably should have expected that any claims they had against Rizzo's subcontractors could have been raised in the context of the arbitration. Accordingly, we agree with the Appellate Court that the defendants and Rizzo were in privity for purposes of res judicata and, therefore, that the trial court improperly denied their motions for summary judgment on that basis.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] For brevity, we use the term "subcontractors" to refer both to direct subcontractors of a general contractor and to sub-subcontractors who are hired by and/or answerable to direct subcontractors or other sub-subcontractors.

[2] For this reason, in the remainder of this opinion we refer to the present appellees—Horton, Quaraglia, Lindade, BlueScope, Oakeson, and Munger—collectively as the defendants.

[3] We granted certification, limited to the following question: "Did the Appellate Court properly reverse the trial court's denial of summary judgment based on the doctrine of res judicata when it determined privity existed between the defendant subcontractors and the general contractor after the general contractor had arbitrated issues relating to the construction project with the project owner[s]?" *Girolametti* v. *Michael Horton Associates, Inc.*, 327 Conn. 980, 175 A.3d 42 (2017); accord *Girolametti* v. *Michael Horton Associates, Inc.*, 327 Conn. 981, 175 A.3d 564 (2017); *Girolametti* v. *Michael Horton Associates, Inc.*, 327 Conn. 981, 982, 175 A.3d 42 (2017); *Girolametti* v. *VP Buildings, Inc.*, 327 Conn. 982, 186 A.3d 12 (2017); *Girolametti* v. *VP Buildings, Inc.*, 327 Conn. 983, 175 A.3d 45 (2017). We note that the plaintiffs sought certification as to, and have briefed, various other issues that are peripheral to the certified question, including whether and how claims of fraud, latent defect, and unripe professional, statutory, and warranty obligations influence the res judicata analysis in a case such as this. We address those issues only to the extent that they are encompassed within the certified question.

We also granted permission to Associated General Contractors of Connecticut to file an amicus curiae brief.

[4] Although the question before us is not entirely one of contract law, the same contractual approach is suitable for application to noncontract matters. See I. Ayres & R. Gertner, "Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules," 99 Yale L.J. 87, 88 n.10, 129 (1989); T. Merrill & H. Smith, "Optimal Standardization in the Law of Property: The Numerus Clausus Principle," 110 Yale L.J. 1, 31 (2000).

[5] This court has recognized as much, albeit in a different context, noting that "most . . . construction work is often subcontracted . . . by a general contractor who oversees the entire project and is responsible [to the owner] for the final result." (Internal quotation marks omitted.) *Meadows* v. *Higgins*, 249 Conn. 155, 167, 733 A.2d 172 (1999).

[6] "A submission [of a dispute to arbitration] is unrestricted when . . . the parties' arbitration agreement contains no language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review." (Internal quotation marks omitted.) *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 273 Conn. 86, 89 n.3, 868 A.2d 47 (2005).

[7] It also bears noting that, in *Wheeler*, the defendants asserted res judicata against lot owners who were not party to the prior proceedings and, therefore, had no prior opportunity to litigate their claims, a consideration that framed our preclusion analysis. See *Wheeler* v. *Beachcroft, LLC*, supra, 320 Conn. 166. In the present case, by contrast, res judicata is being asserted against the plaintiffs, who *were* parties to the arbitration and arguably had the opportunity to raise these issues therein.

[8] For example, although the prime contract gave the plaintiffs' architect, Russell J. Larrabee, much of the responsibility for administering the contract, in practice, Larrabee either refused or was not allowed by the plaintiffs to perform that role. The plaintiffs also changed project engineers midstream. The arbitrator found that matters were further complicated by the fact that the plaintiffs contracted separately with various building and design professionals, and that the parties kept virtually no written records of their communications.

[9] See G. Shell, "Res Judicata and Collateral Estoppel Effects of Commercial Arbitration," 35 UCLA L. Rev. 623, 663–65 (1988) ("[T]he court must ask itself what rational parties would have agreed to had the matter of preclusion been explicitly negotiated between them. . . . If a party clearly intended to arbitrate the transaction at issue, then that party should not later be permitted to circumvent the prior arbitration award by suing a person who was functionally central to the transaction but who was technically not a party to the arbitration.").

[10] "Section 1 (b) of the agreement provides: '[Lindade] assumes toward [Rizzo] all obligations, risks, and responsibilities for the Work, which [Rizzo] assumes toward [the plaintiffs] in the Contract Documents, and shall be bound to [Rizzo] in the same manner and to the same extent [Rizzo] is bound to [the plaintiffs] by the Contract Documents.' " *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 173 Conn. App. 639–40; see also C. Ingwalson et al., supra, 6 J. Am. C. Constr. Laws., no. 1, p. 3 ("[p]articularly for those in the construction industry, a clear and express incorporation by reference of one agreement into another is usually effective").

[11] This interpretation of the award also is consistent with the position that the plaintiffs took in the underlying litigation when responding to the defendants' interrogatories. For example, in response to BlueScope's request that the plaintiffs "identify each and every person with whom [they] contracted to procure labor, services, materials and/or equipment for the [p]roject," the plaintiffs responded that they had contracted directly with site work, sprinkler, and test/inspection contractors, but that, otherwise, they "contracted only with Rizzo . . . for the design and construction . . . on the [p]roject" and that, "[a]s part of its representations to the [plaintiffs], Rizzo assumed the responsibility to contract with the required design professionals. . . . Rizzo engaged multiple entities to provide structural engineering services, including . . . [Horton, Munger, VP Buildings, Inc., Lindade, and Quaraglia]." In other words, the plaintiffs themselves drew a clear distinction during the discovery process between subcontractors who were answerable directly to them and those, including all of the defendants, whose responsibility ran directly through Rizzo.