******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

KATHLEEN TRACEY ET AL. *v.*
MIAMI BEACH ASSOCIATION
(AC 43965)

Elgo, Moll and Cradle, Js.

*Syllabus*

The plaintiffs, residents of a neighborhood that was adjacent to waterfront
property owned by the defendant beach association, sought, inter alia,
injunctive relief enjoining the defendant from blocking public access to
and from charging fees and issuing permits for public use of its property.
The defendant acquired the property in 1951 and, shortly thereafter,
erected a fence that prevented the public from accessing the property.
In 1952, owners of property in the adjacent neighborhood brought an
injunctive action against the defendant, alleging violations of their rights
to freely access and use the property and specifically alleging that they
were acting as members of the general public. The 1952 plaintiffs claimed
that H, a prior owner of the property, had, by deed and by his actions
over a period of approximately fifty years, designated the property as
an open way for public use. In 1953, the trial court rendered judgment
in favor of the 1952 plaintiffs. That court found that H had dedicated
the property for public use, ordered the defendant to remove the fence,
and enjoined the defendant from interfering with the rights of the 1952
plaintiffs and the general public to free entry and egress and to free
and unimpeded use and enjoyment of the property in the future. The
public enjoyed unimpeded access to and use of the property until 2017,
when the defendant erected a fence with an entry gate and created a
fee structure and permit plan for the public to access and use the
property. In 2018, the plaintiffs commenced the present action to enforce
the 1953 judgment. Following a trial, the trial court rendered judgment
in favor of the plaintiffs, ordered the defendant to remove the fence,
and enjoined the defendant from erecting another fence and from charg-
ing fees and issuing permits for the use of the property by the public
in the future. On the defendant's appeal to this court, *held*:

1. The trial court's decision to grant injunctive relief to the plaintiffs was
an exercise of the court's equitable powers to protect the integrity of
the 1953 judgment, and the preclusive effect of the 1953 judgment was
more precisely viewed through the lens of the doctrine of merger, which
implicates res judicata only in its general sense.

2. The trial court properly determined that the defendant's conduct was
within the scope of the 1953 judgment and, accordingly, that the 1953
judgment precluded the defendant from restricting public access to and
use of the property: the 1953 judgment plainly recognized the rights of
the general public both to free entry and egress to the property and to
free and unimpeded use and enjoyment of the property along its entire
length and width; moreover, the defendant's erection of a fence and a
gated entrance and imposition of fees and permits in 2017 were restric-
tions encompassed by and in violation of the 1953 judgment.

3. The trial court properly concluded that the plaintiffs were proper parties
in the present case because they were in privity with the 1952 plaintiffs
and thus were entitled to the benefits of the 1953 judgment: the present
case involved the same legal rights as those that were asserted in the
1952 action and memorialized in the 1953 judgment, as the 1952 plaintiffs
specifically alleged that they were acting as members of the general
public to vindicate the rights of the general public, and the plaintiffs in the
present case asserted illegal interference with their rights as members
of the general public to access and use the property in accordance with
the mandate of the 1953 judgment; moreover, the same property was
at issue in both the 1952 action and the present action, the source
of the rights underlying both sets of claims, namely, the conveyance
documents executed by H, was the same in both actions, and, in each
instance, the defendant instituted measures that restricted the public's
ability to freely access and use the property and faced legal challenges
from local residents who sought to vindicate their rights as members
of the general public; furthermore, the 1953 judgment had a preclusive

effect on the defendant with respect to members of the general public because the defendant was a party to the 1952 action and had the opportunity to fully litigate the controversy during that action; additionally, the policies underlying the preclusion doctrines, including achieving finality and repose, promoting judicial economy, and preventing inconsistent judgments, were served by finding the plaintiffs in privity with the 1952 plaintiffs and permitting them to maintain the action to enforce the 1953 judgment.

4. The trial court did not abuse its discretion in exercising its equitable authority to vindicate the 1953 judgment with respect to the plaintiffs' rights to freely access and use the property: the passage of time since the 1953 judgment did not, in itself, make the enforcement of the judgment inequitable, and the defendant failed to offer evidence of any substantive legal change in the terms of the dedication of the property since the 1953 judgment or any other change of circumstances that would make the enforcement of the judgment inequitable; moreover, the public used and enjoyed the property for more than sixty years following the 1953 judgment without obstruction by the defendant, demonstrating that the defendant and the public expected the terms of the 1953 judgment to govern the use of the property in perpetuity; furthermore, the 1953 judgment did not contain any temporal limitations on the relief it provided and there was no applicable statutory limitation period because the action was injunctive in nature.

*(One judge concurring separately)*

Argued January 14, 2021—officially released November 8, 2022

*Procedural History*

Action for, inter alia, an injunction requiring the defendant to remove a fence along the border of certain waterfront property, and for other relief, brought to the Superior Court in the judicial district of New London and tried to the court, *Knox, J.*; judgment for the plaintiffs, from which the defendant appealed to this court; thereafter, the court, *Knox, J.*, granted in part the defendant's motion to stay the judgment. *Affirmed*.

*Daniel J. Krisch*, with whom, on the brief, was *Kenneth R. Slater, Jr.*, for the appellant (defendant).

*William E. McCoy*, for the appellees (plaintiffs).

*Opinion*

ELGO, J. This case involves an action to enforce a judgment that memorialized the rights of the general public to freely access and use a parcel of waterfront property in Old Lyme. Following a bench trial, the trial court concluded that the prior judgment in question precluded the defendant, Miami Beach Association, from restricting public access and use of that property. On appeal, the defendant challenges the propriety of that determination. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. At all relevant times, the plaintiffs, Kathleen Tracy,[1] Robert Breen, Jerry Vowles, and Dee Vowles, resided in an area of Old Lyme known as Sound View, a neighborhood that is adjacent to the property in question. The defendant is a municipal corporation created by special act of the General Assembly in 1949.[2] This appeal concerns the ability of the defendant to restrict public access and use of a parcel of waterfront property owned by the defendant and known as Miami Beach.[3]

Miami Beach originally was owned by Harry J. Hilliard, who conveyed the property to a devisee through his will. Title thereafter changed hands between private individuals several times until the defendant acquired the property via quitclaim deed on July 12, 1951.

The present action concerns prior litigation that transpired soon after the defendant acquired the property. In November, 1951, the defendant constructed a six foot high iron fence that precluded access to Miami Beach. In response, twenty-six owners of property in the adjacent Sound View neighborhood brought an injunctive action (1952 action), alleging violations of their right to freely access and use Miami Beach.[4]

In the introductory paragraph of their complaint, the plaintiffs specifically alleged that, in bringing that injunction action, they were "also acting as members of the general public . . . ." In the first count of their complaint, the plaintiffs alleged that Hilliard "on or about 1900 laid out [Miami Beach] as an 'open way for foot passengers and bicycles only' " and had, "by deed to purchasers of property . . . abutting [Miami Beach], expressly covenanted for himself, his heirs and assigns, that [Miami Beach] would remain an open way for the use of the public . . . ." The plaintiffs further alleged that Hilliard, "by laying out [Miami Beach] on various maps, through his deeds . . . and by his actions, conduct and speech over a period of approximately fifty years, intended and designated [Miami Beach] as an open way for public use." The plaintiffs thus claimed that the erection of the iron fence wrongfully interfered with the rights memorialized in the respective deeds to their properties.

In count two, the plaintiffs claimed a prescriptive right to use Miami Beach "as an open way and as a beach." In the third and final count, the plaintiffs alleged that Hilliard, "[b]y various deeds subsequent to 1892 . . . reserved [Miami Beach] as an open public way for foot passengers and bicycles," that Hilliard had dedicated Miami Beach "to the public," and that "the plaintiffs and other members of the general public accepted the same as a public way and beach and never abandoned it as such." The plaintiffs further alleged that, by erecting the iron fence, the defendant interfered with their rights as "members of the general public to [the] free and unimpeded use of [Miami Beach and] have prevented their free use and enjoyment thereof . . . ."

As the defendant acknowledged in its posttrial brief in the present case, "[i]t is not clear from the file as to whether trial commenced, but the file does reflect that exhibits were presented to the court," and, on February 18, 1953, the court rendered judgment in favor of the plaintiffs on counts one and three (1953 judgment).[5] *Vitello* v. *Corsino*, Superior Court, judicial district of New London, Docket No. 20902 (February 18, 1953) (*Troland, J.*). The court issued a written ruling in which it specifically found that, "prior to the year 1941, [Hilliard] dedicated for public use the strip of land known as [Miami Beach, and] . . . this dedication for such use by [Hilliard] was accepted by the unorganized public and has been continuously used and enjoyed by the public down to the date of the beginning of this action."[6] By way of relief, the court ordered in relevant part: "[T]he [defendant is] . . . hereby enjoined . . . from maintaining and establishing after [May 29] 1953, a steel and wire fence across said [Miami Beach] from the intersection of [Miami Beach] with the west line of Hartford Avenue in [Old Lyme]; and it is further adjudged that the [defendant] and [its] servants and agents . . . are hereby ordered . . . to remove from [Miami Beach] the said steel and wire fence which they have erected . . . and it is further adjudged that the [defendant] and [its] servants and agents be, and they are hereby enjoined . . . from interfering with the rights of the plaintiffs and the unorganized public to free entry and egress, and to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width, from now henceforth . . . ."[7]

It is undisputed that, in the decades following the 1953 judgment, public use of Miami Beach continued without impediment.[8] More than one-half century later, following complaints regarding litter and other inappropriate behavior by beachgoers, the defendant instituted what it termed a "Clean Beach Program" in the fall of 2017. That program involved the erection of a fence with an entrance gate, the monitoring of the gate by security personnel, and the creation of a fee structure and permit program to access and use Miami Beach.

Residents of Old Lyme were permitted to enter and use the beach at no cost, provided they furnished proof of residency. Residents also were permitted to bring nonresident guests to the beach, so long as they purchased a guest pass from the defendant. Nonresident members of the public were obligated to pay a fee to enter and use Miami Beach.

In 2018, the plaintiffs[9] commenced the present action to enforce the 1953 judgment. In the sole count of their complaint, the plaintiffs alleged that the defendant illegally interfered with the public's right to freely access and use Miami Beach "in direct violation" of the 1953 judgment.[10] In so doing, they specifically alleged that the court, in rendering the 1953 judgment, "found that [Miami Beach] . . . is dedicated for public use." They thus sought declaratory and injunctive relief, including an order mandating "the removal of the fence blocking public access to Miami Beach," an order "enjoining the defendant from charging fees and issuing permits for use of Miami Beach," and a declaration that "the [defendant's] actions preventing the plaintiffs' use of Miami Beach . . . are in violation of previous court orders."[11] In its answer, the defendant admitted that the 1953 judgment "was entered" but averred that it "cannot admit or deny the [plaintiffs'] characterization of the judgment in that it speaks for itself." The defendant also summarily denied the allegations of paragraph 10 of the complaint.[12] It did not assert any special defenses or counterclaim.

In his opening remarks at trial, the plaintiffs' counsel explained that the plaintiffs brought the present action to compel the defendant to "abide by the rulings of [the Superior Court] in 1953 to enforce the free and unimpeded right of the public to use Miami Beach." On cross-examination, the following colloquy occurred between Tracy and the defendant's counsel:

"[The Defendant's Counsel]: You want [Miami Beach] to be a public beach, correct?

"[Tracy]: I don't want it to be anything. I want the public to have access to that beach; that's what I want.

"[The Defendant's Counsel]: All right. And they do have access, don't they?

"[Tracy]: No. I don't think they have free, unencumbered access; no, I do not believe that they have that."

The defendant's counsel asked Tracy to "describe what rights" the 1953 judgment conferred on the public with respect to Miami Beach; Tracy responded that the 1953 judgment memorialized "the right to unimpeded access—free, unimpeded access to the unorganized public." Tracy also testified that she "read the [1953 judgment as mandating] that there should be no impediment to the public to use" Miami Beach and opined that "access to [Miami Beach] means you have access to the sand, not just to the water."

Breen, whose family had owned property in Sound View since 1895, was born the year after the 1953 judgment issued. In his testimony, Breen indicated that, with respect to the public's right to use the beach, he never understood it to be limited to "walking purposes only" and testified that the gate and fence erected by the defendant as part of the Clean Beach Program "denies me free and unimpeded access to [Miami Beach] that I had enjoyed the right to use whenever I pleased for most of my life." Breen thus indicated that he sought to have those barriers removed in accordance with the terms of the 1953 judgment. The defendant, by contrast, maintained that it could restrict the use of Miami Beach through the measures implemented as part of its Clean Beach Program.

By memorandum of decision dated January 15, 2020, the trial court ruled in favor of the plaintiffs. After providing a factual overview of both the 1952 action and the present dispute, the court observed: "[F]inal judgments are . . . presumptively valid . . . and collateral attacks on their validity are disfavored. . . . The law aims to invest judicial transactions with the utmost permanency consistent with justice. . . . It has long been accepted that a system of laws upon which individuals, governments and organizations rely to resolve disputes is dependent on according finality to judicial decisions. . . . The convention concerning finality of judgments has to be accepted if the idea of law is to be accepted . . . . [A] party should not be able to relitigate a matter which it already has had an opportunity to litigate." (Citations omitted; internal quotation marks omitted.) The court then emphasized that, "[o]nce a final judgment has been issued, it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment, including injunctive relief." (Internal quotation marks omitted.)

After setting forth those principles of finality, the court noted that the plaintiffs were seeking to enforce the 1953 judgment.[13] The court summarized the dispute between the parties as follows: "[T]he plaintiffs rely on the 1953 judgment of this court that found that [Hilliard] . . . dedicated the beach to public use and the unorganized public accepted this dedication. The defendant claims, notwithstanding the 1953 judgment, that it owns Miami Beach and has the right to restrict access or use thereto."

The court then discussed the doctrines of res judicata and collateral estoppel, finding that the parties were in privity with the parties to the 1952 action, that "[t]here is no evidence that the parties, particularly the defendant, were not presented an opportunity to litigate fully the controversy in 1953," and that the "present controversy is substantially similar to the [1952 action]; the facts and claims for unrestricted use of Miami Beach . . .

are identical." The court emphasized that the 1953 judgment "concluded any controversy on the defendant's restriction of the public's access by installation of a fence on the boundary of Miami Beach" and found that, "[t]he defendant, whatever laudable intentions it may have [in enacting the Clean Beach Program], does not have the right to restrict access to Miami Beach to permit holders or paying users in order to remediate such conduct." The court also noted that the defendant had offered "no evidence of any substantive legal change in the terms of the dedication of Miami Beach since the 1953 judgment. The evidence presented in this case fails to convince the court that [it should] exercise [its] discretion . . . in order to reconsider the issues determined in the 1953 judgment. . . . The defendant's installation of the fence, gated entrance, fees, and permits are restrictions on the public dedication of the beach that violate the 1953 judgment."

Accordingly, the court rendered judgment in favor of the plaintiffs. In exercising its equitable powers to protect the integrity of the 1953 judgment, the court ordered as follows: "[T]he defendant is ordered to remove the fence installed on the boundary of [Miami Beach] now and hereinafter; the defendant is enjoined from maintaining or establishing any other fence on the boundary of [Miami Beach], now and hereinafter, and the defendant is further enjoined from charging fees and issuing permits for use of [Miami Beach] by the public. The defendant shall comply with the [1953] judgment, which bears repeating as follows: the defendant is further enjoined 'from interfering with the rights of the plaintiffs and the unorganized public to free entry and egress, and to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width, now and hereinafter.'" The defendant subsequently filed a motion for reargument, claiming, inter alia, that the court's decision exceeded the scope of the 1953 judgment. The court denied that motion, and this appeal followed.

I

APPLICABLE LEGAL PRINCIPLES

This case concerns the preclusionary effect of the 1953 judgment. For that reason, both the parties and the trial court discussed the doctrine of res judicata throughout this litigation, culminating in the court's determination that the measures implemented by the defendant as part of the Clean Beach Program were "restrictions on the public dedication of [Miami Beach] that violate the 1953 judgment." To properly determine the applicability of res judicata in the present case, additional context regarding that confounding doctrine is necessary.

Res judicata is a term of art of both general and specific meaning. Its general use stands for the proposi-

tion that a valid and final judgment should be accorded preclusive effect. As Justice Blackmun observed decades ago, "[t]he preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology, attributable to the evolution of preclusion concepts over the years. These effects are referred to collectively by most commentators as the doctrine of 'res judicata.' " *Migra* v. *Warren City School District Board of Education*, 465 U.S. 75, 77 n.1, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984); see also *Taylor* v. *Sturgell*, 553 U.S. 880, 892 n.5, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008) (noting "confusing lexicon" surrounding preclusive effect of prior judgment). As the Supreme Judicial Court of Massachusetts has explained, " '[r]es judicata' is the generic term for various doctrines by which a judgment in one action has a binding effect in another" and whose fundamental purpose is "assuring that judgments are conclusive, thus avoiding relitigation of issues that were or could have been raised in the original action." (Citation omitted; internal quotation marks omitted.) *Bagley* v. *Moxley*, 407 Mass. 633, 636, 555 N.E.2d 229 (1990); see also *State* v. *Ellis*, 197 Conn. 436, 464–65, 497 A.2d 974 (1985) (related "concepts" of finality "express no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest"); *Barr* v. *Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992) ("[b]roadly speaking, res judicata is the generic term for a group of related concepts concerning the conclusive effects given final judgments"). In its generic sense, "[r]es judicata encompasses four preclusive effects, each conceptually distinct, which a final personal judgment may have upon subsequent litigation. These are merger, direct estoppel, bar, and collateral estoppel." (Internal quotation marks omitted.) *Lee* v. *Spoden*, 290 Va. 235, 245, 776 S.E.2d 798 (2015); see also *Lawlor* v. *National Screen Service Corp.*, 349 U.S. 322, 326 n.6, 75 S. Ct. 865, 99 L. Ed. 1122 (1955) (noting that "[t]he term res judicata is used broadly in the Restatement [(First) of Judgments] to cover merger, bar, collateral estoppel, and direct estoppel").

In its specific sense, res judicata refers particularly to claim preclusion and provides that "a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action [between the same parties or those in privity with them] on the same claim."[14] (Internal quotation marks omitted.) *Girolametti* v. *Michael Horton Associates, Inc.*, 332 Conn. 67, 75, 208 A.3d 1223 (2019). Under Connecticut law, the doctrine of res judicata is pleaded as a special defense. See, e.g., *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 27, 633 A.2d 1368 (1993); *Larmel* v. *Metro North Commuter Railroad Co.*, 200 Conn. App. 660, 667 n.9, 240 A.3d 1056 (2020), aff'd, 341 Conn. 332, 267 A.3d 162 (2021); Practice Book § 10-50. Its primary posture is defensive in nature, in that it bars relitigation of a

claim on which "a valid and final personal judgment" has been rendered in favor of a party. 1 Restatement (Second), Judgments §§ 18 and 19 (1982). Indeed, we are aware of no Connecticut appellate authority in which res judicata has been endorsed for offensive use with respect to claim preclusion, and for good reason: "Offensive claim preclusion is nonexistent. A plaintiff cannot reassert a claim that he has already won." *Robbins* v. *MED-1 Solutions, LLC*, 13 F.4th 652, 657 (7th Cir. 2021); see also *St. Paul Mercury Ins. Co.* v. *Williamson*, 224 F.3d 425, 439 (5th Cir. 2000) (res judicata "is typically a defensive doctrine"); *Suryan* v. *CSE Mortgage, L.L.C.*, Docket No. 0452, 2017 WL 3667657, *15 (Md. Spec. App. August 25, 2017) ("Maryland has not recognized the offensive use of res judicata, and in those jurisdictions where its use has been attempted, it generally has been rejected").

In the present case, the plaintiffs did not attempt to wield the doctrine of res judicata offensively but, rather, sought something fundamentally distinct: vindication of the claim asserted in the 1952 action and embodied in the 1953 judgment.[15] As the trial court noted in its memorandum of decision, the present action is one to enforce a prior judgment of the Superior Court.[16]

An action to enforce a prior judgment is the consequence of the doctrine of merger, memorialized in the Restatement (Second) of Judgments and our decisional law, by which a plaintiff's "claim is extinguished and rights upon the judgment are substituted for it" following the rendering of a valid and final judgment.[17] 1 Restatement (Second), supra, § 18, comment (a), p. 152; *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 348, 15 A.3d 601 (2011); see also *Milwaukee County* v. *M. E. White Co.*, 296 U.S. 268, 275, 56 S. Ct. 229, 80 L. Ed. 220 (1935) ("[a] cause of action on a judgment is different from that upon which the judgment was entered"); *National Union Fire Ins. Co. of Pittsburgh* v. *Owenby*, 42 Fed. Appx. 59, 63 (9th Cir. 2002) (explaining that "[t]he doctrine that a judgment creates its own cause of action is an entirely practical legal device, the purpose of which is to facilitate the goal of securing satisfaction of the original cause of action"), cert. denied, 538 U.S. 950, 123 S. Ct. 1629, 155 L. Ed. 2d 494 (2003); *Fidelity National Financial, Inc.* v. *Friedman*, 225 Ariz. 307, 310, 238 P.3d 118 (2010) ("every judgment continues to give rise to an action to enforce it, called an action upon a judgment" (internal quotation marks omitted)). Accordingly, when a party thereafter seeks to enforce those rights by maintaining "an action upon the judgment"; 1 Restatement (Second), supra, § 18 (1), pp. 151–52; *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, supra, 348; it is not seeking to "relitigate a matter [that] it already has had an opportunity to litigate." (Internal quotation marks omitted.) *Wellswood Columbia, LLC* v. *Hebron*, 327 Conn. 53, 66, 171 A.3d

409 (2017). Rather, it is attempting to enforce a valid judgment and, by extension, vindicate the very claim that gave rise thereto. For that reason, an action to enforce a prior judgment does not implicate res judicata in its specific sense.

Merger is a doctrine of preclusion that falls within res judicata in its generic sense. See *Lawlor* v. *National Screen Service Corp.*, supra, 349 U.S. 326; *Lee* v. *Spoden*, supra, 290 Va. 245. Merger has been referred to as a component of res judicata; see *Freedom Mortgage Corp.* v. *Burnham Mortgage, Inc.*, 569 F.3d 667, 672 (7th Cir. 2009); and as "an aspect of res judicata which prevents relitigation of existing judgments . . . ." (Internal quotation marks omitted.) *Allison-Bristow Community School District* v. *Iowa Civil Rights Commission*, 461 N.W.2d 456, 460 (Iowa 1990). Accordingly, the doctrines of merger and res judicata in its generic sense "may be regarded as identical and, in some instances, the terms 'res judicata' and 'merger' have been used interchangeably." (Footnote omitted.) 46 Am. Jur. 2d 799, Judgments § 431 (2017); cf. *Legassey* v. *Shulansky*, 28 Conn. App. 653, 656, 611 A.2d 930 (1992) ("Connecticut's res judicata rules are derived from the theory of merger . . . set out in the Restatement (Second) of Judgments").

That context convinces us that the issue of the preclusive effect of the 1953 judgment is more precisely viewed through the lens of the doctrine of merger and the Superior Court's authority to enforce a prior judgment, which implicates res judicata in its general sense. Although the trial court also discussed both claim preclusion and collateral estoppel in its memorandum of decision, we are mindful that a judicial opinion "must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding." *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 424–25, 3 A.3d 919 (2010); see also *McGaffin* v. *Roberts*, 193 Conn. 393, 408, 479 A.2d 176 (1984) ("[w]e examine the trial court's memorandum of decision to understand better the basis of the court's decision and to determine the reasoning for the conclusion reached by the trial court"), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985). The court's decision expressly acknowledges the unique context in which the issue of preclusion arises in this case—an attempt by the plaintiffs to enforce a prior judgment of the Superior Court—and the court's reasoning comports with the principles of finality that underlie the doctrine of merger. Read as a whole, we therefore construe the court's decision to grant injunctive relief to the plaintiffs in this action to enforce a prior judgment as an exercise of its equitable powers to protect the integrity of the 1953 judgment.[18]

## II

## SCOPE OF 1953 JUDGMENT

In its memorandum of decision, the court held that the measures implemented by the defendant as part of the Clean Beach Program were "restrictions on the public dedication of [Miami Beach] that violate the 1953 judgment." The defendant, by contrast, essentially argues that those measures merely "regulate" access and use of Miami Beach and, thus, are outside the scope of the 1953 judgment.[19] Whether the court properly determined that the defendant's conduct fell within the scope of the 1953 judgment presents a question of law, over which our review is plenary. See *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, 193 Conn. App. 381, 439, 219 A.3d 801 (2019) (affording plenary review "to the extent that we are required to interpret the court's judgment"), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020), and cert. denied, 334 Conn. 911, 221 A.3d 446 (2020); see also *Garguilo* v. *Moore*, 156 Conn. 359, 365, 242 A.2d 716 (1968) (explaining, in action to enforce prior judgment, that "resolution of the issues raised in this action necessarily required the trial court to interpret the terms of the [prior] judgment").

"The construction of a judgment is a question of law for the court. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The judgment should admit of a consistent construction as a whole. . . . To determine the meaning of a judgment, we must ascertain the intent of the court from the language used and, if necessary, the surrounding circumstances." (Internal quotation marks omitted.) *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 355, 133 A.3d 402 (2016).

The court's interpretation of the 1953 judgment arises in the context of an action to enforce that judgment. It is well established that "[t]he Superior Court has the inherent authority to enforce its orders." *Rozbicki* v. *Gisselbrecht*, 152 Conn. App. 840, 846, 100 A.3d 909 (2014), cert. denied, 315 Conn. 922, 108 A.3d 1123 (2015). As our Supreme Court has explained, "the trial court's continuing jurisdiction to effectuate prior judgments . . . is not separate from, but, rather, *derives* from, its equitable authority to vindicate judgments." (Emphasis in original.) *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 241, 796 A.2d 1164 (2002). For that reason, "it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Rocque* v. *Light Sources, Inc.*, 275 Conn. 420, 433, 881 A.2d 230 (2005); see also *Connecticut Pharmaceutical Assn., Inc.* v. *Milano*, 191 Conn. 555, 563–64, 468 A.2d 1230 (1983) ("the court, in the exercise of its equitable powers, necessarily had the authority to fashion what-

ever orders were required to protect the integrity" of prior judgment); *National Law Center on Homelessness & Poverty* v. *United States Veterans Administration*, 98 F. Supp. 2d 25, 26–27 (D. D.C. 2000) ("[a] court's powers to enforce its own injunction by issuing additional orders is broad . . . particularly where the enjoined party has not fully complied with the court's earlier orders" (citation omitted; internal quotation marks omitted)).

Historically, courts of equity entertained actions to execute a decree, the precursor to actions to enforce a judgment. "A bill to execute a decree, is a bill assuming, as its basis, the principle of the decree, and seeking merely to carry it into effect." *Huddleston* v. *Williams*, 48 Tenn. 579, 581 (1870). As the United States Supreme Court explained: "It is well settled that a court of equity has jurisdiction to carry into effect its own orders, decrees, and judgments . . . . [W]here a supplemental bill is brought in aid of a decree, it is merely to carry out and to give fuller effect to that decree, and not to obtain relief of a different kind on a different principle . . . ." (Internal quotation marks omitted.) *Root* v. *Woolworth*, 150 U.S. 401, 410–11, 14 S. Ct. 136, 37 L. Ed. 1123 (1893). The "main purpose" of an action to enforce a judgment likewise is to "facilitate the ultimate goal of securing satisfaction of the original cause of action." (Internal quotation marks omitted.) *Salinas* v. *Ramsey*, 234 So. 3d 569, 571 (Fla. 2018).

Under Connecticut law, when a party obtains a valid and final judgment, "[t]he plaintiff's original claim is . . . merged in the judgment." (Internal quotation marks omitted.) *Duhaime* v. *American Reserve Life Ins. Co.*, 200 Conn. 360, 364, 511 A.2d 333 (1986). An action to enforce a judgment ordinarily involves no new claim or cause of action—it merely is an attempt to carry out and effectuate a prior decree. See *Root* v. *Woolworth*, supra, 150 U.S. 411. For that reason, an action to enforce a judgment necessarily involves the same underlying claim as that which animated the prior judgment.

Accordingly, when a party seeks to enforce a prior judgment, the critical question is whether the prior judgment encompasses the conduct of which the plaintiff now complains. See *Garguilo* v. *Moore*, supra, 156 Conn. 361–65 (in "action to enforce the terms of the [prior] judgment," it is "necessary to inquire into the meaning and scope of the provisions contained in that judgment"). Because a valid and final judgment manifests the merger of all claims that were brought in the prior action, conduct that falls within the scope of the prior judgment necessarily involves the same claim as that advanced in the prior action and, thus, is subject to preclusion.[20] Moreover, "[w]hen the plaintiff brings an action upon the judgment, the defendant cannot avail himself of defenses which he might have interposed in

the original action" because those defenses would be responsive to the merged claims. 1 Restatement (Second), supra, § 18, comment (c), p. 154.

Because the critical inquiry in considering an action to enforce is whether the conduct in question is within the scope of the prior judgment, it is necessary to compare the complaint in the second action with the claims that were (1) alleged in the pleadings of the prior action and (2) resolved in the judgment rendered by the court. See *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 190, 629 A.2d 1116 (1993) (measuring preclusive effect of prior judgment by comparing "the complaint in the second action with the pleadings and the judgment in the earlier action"); *Dept. of Public Safety* v. *Freedom of Information Commission*, 103 Conn. App. 571, 582 n.10, 930 A.2d 739 (judicial decision "stands only for those issues presented to, and considered by, the court"), cert. denied, 284 Conn. 930, 934 A.2d 245 (2007); cf. *Nutmeg Housing Development Corp.* v. *Colchester*, 324 Conn. 1, 14 n.4, 151 A.3d 358 (2016) ("[i]t is fundamental to our law that the right of a [party] to recover is limited to the allegations in his [pleadings]" (internal quotation marks omitted)).

Accordingly, our analysis begins with an examination of the 1952 action. At issue was the defendant's construction of a six foot high iron fence that impaired the ability of the general public to freely access and use Miami Beach. In the third count of their complaint, the plaintiffs alleged that the defendant had "interfered with the rights . . . of the general public to free and unimpeded use of [Miami Beach], [had] prevented their free use and enjoyment thereof, and [had] caused . . . said general public irreparable loss and injury."

In rendering judgment in favor of the plaintiffs, the court first noted that the plaintiffs in the 1952 action sought both "a mandatory injunction requiring [the defendant] to remove from [Miami Beach] all obstructions to free entry and egress thereon," and "an injunction restraining [the defendant] from interfering with the rights of the plaintiffs to free entry and egress, and to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width from now henceforth . . . ." The court specifically found that Hilliard had "dedicated for public use the strip of land known as [Miami Beach]" and that "this dedication for such use by [Hilliard] was accepted by the unorganized public and has been continuously used and enjoyed by the public down to the date of the beginning of [the 1952] action." The court then ordered in relevant part: "[The defendant is] hereby enjoined . . . from maintaining and establishing . . . a steel and wire fence across [Miami Beach and must] remove from [Miami Beach] the . . . fence which [it has] erected . . . and it is further adjudged that [the defendant is] hereby

enjoined . . . from interfering with the rights of the plaintiffs and the unorganized public to free entry and egress, and to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width, from now henceforth . . . ."

In the present case, the plaintiffs alleged in their complaint that the court, in rendering the 1953 judgment, had "found that [Miami Beach] . . . is dedicated for public use." The plaintiffs further alleged that measures implemented by the defendant as part of the Clean Beach Program illegally interfered with the right of the general public to freely access and use Miami Beach. See footnote 12 of this opinion. The plaintiffs thus requested, inter alia, injunctive relief "ordering the removal of the fence blocking public access to Miami Beach" and "enjoining the defendant from charging fees and issuing permits for use of Miami Beach."

In its principal appellate brief, the defendant concedes that it "does not have the right to prevent access" to Miami Beach in light of the mandate of the 1953 judgment but argues that the Clean Beach Program and fence merely "regulate" access and use of Miami Beach. For that reason, the defendant claims that the court improperly concluded that the 1953 judgment precludes it from "defending" its Clean Beach Program because it is not the same claim, and its motives and the expectations of the parties are different. We do not agree.

In the third count of their complaint, the plaintiffs in the 1952 action alleged in relevant part that the defendant interfered with the rights of the plaintiffs and other members of the general public "to free and unimpeded use" of Miami Beach, and alleged that the defendant had "prevented their free use and enjoyment thereof . . . ." In rendering judgment in favor of the plaintiffs, the court agreed and found that Hilliard had "dedicated for public use the strip of land known as [Miami Beach]," and that "this dedication for such use by [Hilliard] was accepted by the unorganized public and has been continuously used and enjoyed by the public down to the date of the beginning of [the 1952] action." The court then ordered in relevant part: "[The defendant is] hereby enjoined . . . from maintaining and establishing . . . a steel and wire fence across [Miami Beach and must] remove from [Miami Beach] the . . . fence which [it has] erected . . . and it is further adjudged that [the defendant is] hereby enjoined . . . from interfering with the rights of the plaintiffs and the unorganized public to *free* entry and egress, and to *free and unimpeded use and enjoyment* of [Miami Beach] along its entire length and width, from now henceforth . . . ." (Emphasis added.)

Under Connecticut law, "judgments are to be construed in the same fashion as other written instruments." (Internal quotation marks omitted.) *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, supra, 320 Conn.

355. It is well established that "[a]n interpretation which gives effect to all provisions of the [written instrument] is preferred to one which renders part of the writing superfluous, useless or inexplicable." 11 R. Lord, Williston on Contracts (4th Ed. 2012) § 32:5, p. 704; see also *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 298, 685 A.2d 305 (1996) (parties do not insert meaningless provisions in written agreements); *Downs* v. *National Casualty Co.*, 146 Conn. 490, 495, 152 A.2d 316 (1959) ("[e]very provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative"); *Johnson* v. *Allen*, 70 Conn. 738, 744, 40 A. 1056 (1898) ("We cannot . . . regard [certain provisions] as surplusage, nor ignore them. We must take the [written instrument] as a whole as we find it and give effect, if possible to all its terms . . . .").

The 1953 judgment plainly recognized the right of the general public both "to free entry and egress" on Miami Beach and "to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width . . . ."[21] As such, the court properly concluded that the defendant's erection of a fence, a gated entrance, and the imposition of fees and permits are restrictions encompassed by, and thus violative of, the 1953 judgment.

The conduct complained of by the plaintiffs in the present case—the construction of a fence with an entrance gate, and the creation of a fee structure and permit program to use Miami Beach—is within the scope of the 1953 judgment, which enjoined the defendant "from maintaining and establishing" a fence on the property and from interfering with the right of the "unorganized public to free entry and egress, and to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width . . . ." We therefore conclude that the court properly determined that the 1953 judgment precluded the defendant from restricting public access and use of Miami Beach.

### III

### PRIVITY

The defendant also claims that the court improperly concluded that the plaintiffs were in privity with the plaintiffs in the 1952 action such that they could enforce the 1953 judgment. More specifically, it argues that the plaintiffs, as nonparties to the 1952 action, are not entitled to the benefits of that prior judgment. We do not agree.[22]

"Privity is a word which expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties. . . . The statement that a person is

bound by or has the benefit of a judgment as a privy is a short method of stating that under the circumstances and for the purpose of the case at hand he is bound by and entitled to the benefits of all or some of the rules of res judicata by way of merger . . . ." (Citations omitted.) Restatement (First), Judgments § 83, comment (a), pp. 389–90 (1942). As our Supreme Court has explained, "[p]rivity is a difficult concept to define precisely. . . . There is no prevailing definition of privity to be followed automatically in every case. It is not a matter of form or rigid labels; rather it is a matter of substance. In determining whether privity exists, we employ an analysis that focuses on the functional relationships of the parties. Privity is not established by the mere fact that persons may be interested in the same question or in proving or disproving the same set of facts. Rather, it is, in essence, a shorthand statement for the principle that [the doctrines of preclusion] should be applied only when there exists such an identification in interest of one person with another as to represent the same legal rights so as to justify preclusion." (Citation omitted.) *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 813–14, 695 A.2d 1010 (1997).

"A key consideration in determining the existence of privity is the sharing of the same legal right by the parties allegedly in privity." (Internal quotation marks omitted.) Id., 813. "[O]ne person is in privity with another and is bound by and entitled to the benefits of a judgment as though he was a party when there is such an identification of interest between the two as to represent the same legal right . . . ." (Internal quotation marks omitted.) *Collins* v. *E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 176 (3d Cir. 1994).

The present case involves the same legal rights that were asserted in the 1952 action and memorialized in the 1953 judgment. The plaintiffs in the 1952 action specifically alleged in their complaint that they were "acting as members of the general public" to vindicate "the rights of the plaintiffs and other members of the general public to free and unimpeded use" of Miami Beach. In rendering the 1953 judgment, the court enjoined the defendant "from interfering with the rights of . . . the unorganized public to free entry and egress, and to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width, from now henceforth . . . ." The present case is predicated entirely on those same legal rights, as the plaintiffs asserted illegal interference with their rights as members of the general public to access and use Miami Beach; see footnote 10 of this opinion; in accordance with the mandate of the 1953 judgment.[23]

It also is noteworthy that this action involves a real property dispute. As the United States Supreme Court has observed, "[t]he policies advanced by the doctrine of res judicata perhaps are at their zenith in cases con-

cerning real property, land and water." *Nevada* v. *United States*, 463 U.S. 110, 129 n.10, 103 S. Ct. 2906, 77 L. Ed. 2d 509 (1983). For that reason, "[a] finding of privity [when there is a sufficiently close relationship between the parties] is particularly appropriate in cases involving interests in real property . . . ." *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 322 F.3d 1064, 1082 (9th Cir. 2003). Here, the same parcel of property underlies both the 1952 action and the present action. In addition, the source of the right underlying the claims of both sets of plaintiffs is the same—the conveyance instruments executed by Hilliard, the original owner of the property in question.[24] Moreover, both actions originated from nearly identical circumstances. In each instance, the defendant instituted measures that restricted the public's ability to freely access and use Miami Beach without impediment and faced legal challenges from residents of the abutting Sound View neighborhood who sought to vindicate their rights as members of the general public.

As the Restatement (Second) of Judgments notes, "[a] judgment in an action that determines interests in real . . . property . . . [c]onclusively determines the claims of the parties to the action regarding their interests; and . . . [h]as preclusive effects upon a person who succeeds to the interest of a party to the same extent as upon the party himself." 2 Restatement (Second), supra, § 43, p. 1. The party facing preclusion here—the defendant—was a party to the 1952 action. Because that action expressly was predicated on the plaintiffs' interests as members of the general public, and because the 1953 judgment, by its plain terms, memorialized the right of "the unorganized public" to freely access and use Miami Beach, that judgment has preclusive effect on the defendant vis-à-vis members of the general public like the plaintiffs here.

We also are mindful that the "crowning consideration [in resolving the privity question is] that the interest of the party to be precluded must have been sufficiently represented in the prior action so that [preclusion] is not inequitable." (Internal quotation marks omitted.) *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 332 Conn. 77. The party to be precluded here—the defendant—was a party to the 1952 action, and, thus, the core concern in a privity analysis is not implicated here. As the court found in its memorandum of decision, "[t]here is no evidence that . . . [the defendant was] not presented an opportunity to litigate fully the controversy in 1953." The record before us supports that determination and confirms that the defendant participated robustly in the 1952 action.

In light of the foregoing, the trial court properly concluded that the plaintiffs were in privity with the prior plaintiffs and thus entitled to the benefits of the 1953

judgment. As members of the general public, the plaintiffs in the present case share the same legal right as the plaintiffs in the 1952 action; see *Mazziotti* v. *Allstate Ins. Co.*, supra, 240 Conn. 813–14; and the record demonstrates that the defendant was a party to that prior action. Moreover, the policies that underlie our preclusion doctrines—"achieving finality and repose, promoting judicial economy, and preventing inconsistent judgments"; *Girolametti* v. *Michael Horton Associates, Inc.*, supra, 332 Conn. 76;—would be served by finding the plaintiffs in privity with the plaintiffs in the 1952 action and permitting them to maintain this action to enforce the 1953 judgment. We therefore conclude that the plaintiffs were proper parties in the present case.

## IV

## EQUITABLE CONSIDERATIONS

As a final matter, we note that, when an action to enforce involves a judgment that "calls for performance, positive or negative, over a period of time, the question may arise whether circumstances have so changed as to make enforcement inequitable." 1 Restatement (Second), supra, § 18, comment (c), p. 155. On appeal, the defendant argues that it is unfair to bind it to the terms of the 1953 judgment due to the passage of decades. We disagree.

As the court found in its memorandum of decision, the defendant offered "no evidence of any substantive legal change in the terms of the dedication of Miami Beach since the 1953 judgment." Unlike the stipulated judgment at issue in *Nauss* v. *Pinkes*, 2 Conn. App. 400, 480 A.2d 568, cert. denied, 194 Conn. 808, 483 A.2d 612 (1984), the 1953 judgment here contains no temporal limitations on the relief it provided.[25] Moreover, the public thereafter used and enjoyed Miami Beach for more than sixty years without obstruction by the defendant.[26] That conduct over one-half of a century demonstrates that both the defendant and members of the general public expected the terms of the 1953 judgment to govern the use of Miami Beach in perpetuity and undermines the defendant's claim that it is inequitable to enforce that judgment now.

Furthermore, the fact that the defendant's noncompliance with the 1953 judgment arose decades later has little bearing on the plaintiffs' ability to vindicate the rights memorialized therein. Although the General Assembly has imposed a twenty-five year statute of limitations on an action to enforce a judgment for money damages; see General Statutes § 52-598; no statutory limitation period exists for an action to enforce a judgment that is injunctive in nature. See *Quickpower International Corp.* v. *Danbury*, 69 Conn. App. 756, 759, 796 A.2d 622 (2002) (concluding that limitation period contained in "§ 52-598 (a) does not apply" because plaintiff was "seeking an injunction, not dam-

ages"); cf. *Bear* v. *Iowa District Court*, 540 N.W.2d 439, 441 (Iowa 1995) ("[t]he mere passage of time . . . does not invalidate a permanent injunction").

As the court specifically noted in setting forth the applicable legal standard in its memorandum of decision, "it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Rocque* v. *Light Sources, Inc.*, supra, 275 Conn. 433; see also *Connecticut Pharmaceutical Assn., Inc.* v. *Milano*, supra, 191 Conn. 563–64. The appellate courts of this state review "the exercise of a trial court's equitable powers for an abuse of discretion." *JPMorgan Chase Bank, National Assn.* v. *Essaghof*, 336 Conn. 633, 639, 249 A.3d 327 (2020). On the record before us, we conclude that the court did not abuse its discretion in exercising its equitable authority to vindicate the 1953 judgment with respect to the plaintiffs' right to freely access and use Miami Beach.

The judgment is affirmed.

In this opinion CRADLE, J., concurred.

[1] Although her last name appears as "Tracey" in the case caption, the plaintiff Kathleen Tracy testified at trial that her last name is Tracy.

[2] By the terms of its charter, the defendant is permitted, inter alia, to enact ordinances "to care for the beaches and waterfronts," to "prevent the deposit upon property within the limits of [the] association of refuse, garbage or waste material of any kind," and "to regulate and limit the carrying on within the limits of said association of any business that will, in the opinion of the [association], be prejudicial to public health or dangerous to or constitute an unreasonable annoyance to those living or owning property in the vicinity thereof . . . ."

[3] At the time of both the defendant's acquisition of the property and the 1952 action discussed herein, the parcel was referred to as "Long Island Avenue" and consisted of undeveloped land along the Long Island Sound coast. For clarity, we refer to that waterfront parcel as Miami Beach throughout this opinion.

[4] The plaintiffs named the defendant and Nunzio Corsino as defendants in the 1952 action. Although the record before us indicates that Corsino conveyed Miami Beach to the defendant by quitclaim deed in 1951, the pleadings contain no particular allegations with respect to Corsino.

[5] In its written ruling, the court stated in relevant part: "The court, *having heard the parties*, finds the issues upon the first count for the plaintiffs . . . and also finds the issues for all of the plaintiffs upon the third count . . . ." (Emphasis added.) The plaintiffs withdrew count two before judgment was rendered. Cf. *Roche* v. *Fairfield*, 186 Conn. 490, 499, 442 A.2d 911 (1982) ("the unorganized public cannot acquire rights by prescription").

[6] As its name implies, the term "unorganized public" refers to "the public at large . . . rather than . . . one person, a limited number of persons, or a restricted group." (Internal quotation marks omitted.) *State* v. *Boucher*, 11 Conn. App. 644, 650, 528 A.2d 1165 (1987) (*Daly, J.*, dissenting), rev'd on other grounds, 207 Conn. 612, 541 A.2d 865 (1988); see also *Oxford* v. *Beacon Falls*, 183 Conn. 345, 347, 439 A.2d 348 (1981) ("[a] public beach is one . . . open to the common use of the public, and which the unorganized public and each of its members have a right to use" (internal quotation marks omitted)); *Montanaro* v. *Aspetuck Land Trust, Inc.*, 137 Conn. App. 1, 15–16, 48 A.3d 107 (using term "unorganized public" synonymously with term "general public"), cert. denied, 307 Conn. 932, 56 A.3d 715 (2012).

[7] Although the defendant argues that the 1953 judgment was a stipulated judgment, it concedes, as it must, that "[a] valid judgment or decree entered by agreement or consent operates as res judicata to the same extent as a judgment or decree rendered after answer and contest." *Gagne* v. *Norton*, 189 Conn. 29, 31, 453 A.2d 1162 (1983); see also *SantaMaria* v. *Manship*,

7 Conn. App. 537, 542, 510 A.2d 194 ("[a] stipulated judgment may operate as res judicata to the same extent as a judgment after a contested trial"), cert. denied, 201 Conn. 807, 515 A.2d 378 (1986). As the Restatement (Second) of Judgments explains, "[w]hen the plaintiff recovers a valid and final personal judgment, his original claim is extinguished and rights upon the judgment are substituted for it. The plaintiff's original claim is said to be 'merged' in the judgment. . . . *It is immaterial whether the judgment was rendered upon a verdict . . . or upon consent . . . .*" (Emphasis added.) 1 Restatement (Second), Judgments § 18, comment (a), p. 152 (1982). For that reason, actions to enforce stipulated judgments properly are brought in the Superior Court. See, e.g., *Garguilo* v. *Moore*, 156 Conn. 359, 242 A.2d 716 (1968); *Ghio* v. *Liberty Ins. Underwriters, Inc.*, 212 Conn. App. 754, 276 A.3d 984, cert. denied, 345 Conn. 909,      A.3d      (2022); *Haworth* v. *Dieffenbach*, 133 Conn. App. 773, 38 A.3d 1203 (2012); *Nauss* v. *Pinkes*, 2 Conn. App. 400, 480 A.2d 568, cert. denied, 194 Conn. 808, 483 A.2d 612 (1984).

[8] In its principal appellate brief, the defendant concedes that "[t]he public used [Miami Beach] for decades" after the 1953 judgment was rendered.

[9] The plaintiffs were longtime patrons of Miami Beach and, like the plaintiffs in the 1952 action, all owned property in the adjacent Sound View neighborhood.

[10] Unlike the plaintiffs in the 1952 action, the plaintiffs in the present case have raised no claim regarding the rights memorialized in the deeds to their Sound View properties. Rather, this action is predicated solely on their rights as members of the general public to freely access and use Miami Beach.

[11] The plaintiffs also requested "a [d]eclaratory [o]rder that Miami Beach is a public beach." In rendering judgment in favor of the plaintiffs, the trial court did not grant that request. Rather, the court emphasized that "[t]he present case . . . involves a beach dedicated for public use from *private property* rather than a town owned beach . . . ." (Emphasis added.) The propriety of that determination is not at issue in this appeal.

[12] In paragraph 10 of the operative complaint, the plaintiffs specifically alleged: "The [defendant has] hindered and violated the rights of the plaintiffs to freely access [Miami Beach], to wit:

"a. They have and continue to restrict public access to Miami Beach without any grant of authority to do so.

"b. They are in direct violation of the 1953 judgment . . . and [its] court orders against the defendant.

"c. They are charging fees to the public for use of a public beach without any grant of legal authority to do so.

"d. They are issuing permits for use of a public beach without any grant of legal authority to do so.

"e. The defendant's actions have a chilling effect on the rights of the public to [Miami Beach]."

[13] Indeed, after noting the applicable legal standard, the court titled the next section of its memorandum of decision "Enforcement of 1953 Judgment."

[14] For res judicata to apply in the specific sense of claim preclusion, "four elements must be met: (1) the judgment must have been rendered on the merits by a court of competent jurisdiction; (2) the parties to the prior and subsequent actions must be the same or in privity; (3) there must have been an adequate opportunity to litigate the matter fully; and (4) the same underlying claim must be at issue." *Wheeler* v. *Beachcroft, LLC*, 320 Conn. 146, 156–57, 129 A.3d 677 (2016).

[15] The plaintiffs first invoked the doctrine of res judicata in their posttrial brief to describe the preclusive effect of the 1953 judgment.

[16] In part III A of its memorandum of decision, in which it set forth the applicable legal standard, the trial court observed that "[f]inal judgments are . . . presumptively valid . . . and collateral attacks on their validity are disfavored." (Internal quotation marks omitted.) The court explained that, "[o]nce a final judgment has been issued, it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment, including injunctive relief," and emphasized that "[c]ourts have in general the power to fashion a remedy appropriate to the vindication of a prior . . . judgment." (Citations omitted; internal quotation marks omitted.) The court then proceeded to discuss the doctrine of res judicata in part III B of its decision, which is titled "Enforcement of 1953 Judgment."

[17] In *Duhaime* v. *American Reserve Life Ins. Co.*, 200 Conn. 360, 364, 511 A.2d 333 (1986), our Supreme Court's reference to an action to enforce a judgment was discussed in the context of the principle of res judicata

and, more specifically, merger: "The principles that govern res judicata are described in Restatement (Second), Judgments (1982). The basic rule is that of § 18, which states in relevant part: 'When a valid and final personal judgment is rendered in favor of the plaintiff: (1) [t]he plaintiff cannot thereafter maintain an action on the original claim or any part thereof, *although he may be able to maintain an action upon the judgment . . . .*' As comment (a) to § 18 explains, '[w]hen the plaintiff recovers a valid and final personal judgment, his original claim is extinguished and rights upon the judgment are substituted for it. The plaintiff's original claim is said to be "merged" in the judgment.' Our recent case law has uniformly approved and applied the principle of claim preclusion or merger." (Emphasis added.)

[18] We also note that, to the extent that "our rationale is slightly different than that of the trial court," it is "axiomatic that [an appellate court] may affirm a proper result of the trial court for a different reason." (Internal quotation marks omitted.) *Silano* v. *Cooney*, 189 Conn. App. 235, 241, 207 A.3d 84 (2019); see also *Helvering* v. *Gowran*, 302 U.S. 238, 245, 58 S. Ct. 154, 82 L. Ed. 224 (1937) ("the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground").

[19] To the extent that the defendant has argued that the court improperly "expanded the reach" of the prior judgment and characterizes the scope of the judgment on page 19 of its brief, we acknowledge that the defendant preserved its claim regarding the scope of the 1953 judgment in its February 4, 2020 motion for reargument.

[20] For that reason, application of the transactional test that governs res judicata claims in the specific sense; see, e.g., *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 604, 922 A.2d 1073 (2007); is inapposite in the context of an action to enforce a prior judgment. The transactional test operates as a screening mechanism to prevent a party from obtaining "a second bite at the apple [when] the present claims are ones arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not in the [prior action]." (Internal quotation marks omitted.) *Larry* v. *Powerski*, 148 F. Supp. 3d 584, 597 (E.D. Mich. 2015). When a party brings an action to enforce a prior judgment, the prior claims, while relevant for purposes of considering the scope of the judgment, are not themselves being relitigated because they have been merged into the judgment.

[21] Webster's Third New International Dictionary defines the word "unimpeded" as "free from anything that impedes or hampers." Webster's Third New International Dictionary (2002) p. 2499.

Black's Law Dictionary defines the word "enjoyment" as "1. Possession and use, esp. of right of property. 2. The exercise of a right." Black's Law Dictionary (11th Ed. 2019) p. 670. In a more general sense, enjoyment is defined as "the action or state of enjoying something: the deriving of pleasure or satisfaction (as in the possession of anything)." Webster's Third New International Dictionary, supra, p. 754. The word "enjoy," in turn, is defined as "to have in possession for one's use or satisfaction . . . ." Id.

[22] We appreciate the sentiments expressed in the concurring opinion and recognize that privity and standing are distinct concepts. As one Connecticut judge has observed, there is a "distinction between standing (having a sufficiently colorable claim to be allowed to pursue a claim) and privity (actual effect of an actual or presumed legal relationship) . . . ." *Claridge Associates, LLC* v. *Pursuit Partners, LLC*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-15-6026069-S (November 14, 2018); accord *Ovnik* v. *Podolskey*, 86 N.E.3d 1093, 1100–1101 (Ill. App. 2017) (The court noted "the distinction between standing and privity. Standing refers to whether a litigant is entitled to have the court decide the merits of a dispute or a particular issue and requires some injury in fact to a legally recognized interest. . . . Privity, in turn, exists when parties adequately represent the same legal interests, irrespective of their nominal identities." (Citation omitted; internal quotation marks omitted.)), appeal denied, 94 N.E.3d 676 (Ill. 2018).

While we recognize that the defendant has raised no claim that the plaintiffs lack standing or a colorable claim of aggrievement, we are unaware of any authority that suggests that standing obviates the need to address, when raised by the defendant, a challenge to a plaintiff's claim of privity in an enforcement action where the plaintiffs are not identical to the plaintiffs who secured a favorable judgment in the prior action. Here, the defendant frames its challenge to the court's privity determination as one that operates to "bar the defendant from contesting the current plaintiffs' claims." As we discussed in part I of this opinion, in an action to enforce a valid and final

judgment, the doctrine of merger precludes a defendant from relitigating the underlying claims, including the pursuit of any special defenses or counterclaims it could have raised in the prior action. Because the plaintiffs, as nonparties to the 1952 action, nevertheless claim entitlement to the benefit of that judgment, specifically, those remedies within the scope of the original judgment without having to relitigate the underlying claims via an enforcement action, the defendant's challenge to the court's privity determination is one this court properly must address.

In its principal appellate brief, the defendant argues that nonparties to a prior action generally are not entitled to the benefits of a prior judgment. Our discussion of the issue of privity is confined to the question of whether the plaintiffs in the present case are entitled to the benefits of the 1953 judgment. We are aware of no authority in which a court, in this jurisdiction or elsewhere, has held that privity among parties is a prerequisite to an action to enforce a prior judgment, and we do not so hold in this case. We simply address the claim raised by the defendant regarding the plaintiffs' entitlement to the benefits of the 1953 judgment.

[23] For that reason, the defendant's reliance on *Wheeler* v. *Beachcroft LLC*, supra, 320 Conn. 146, is misplaced. In *Wheeler*, our Supreme Court held that individual lot owners in a neighborhood were not in privity with other lot owners who brought earlier actions "with regard to their prescriptive easement claims . . . ." Id., 168. As the court explained, "[b]ecause parties may share some legal rights and not others, parties may be in privity with respect to some claims, but not others, for res judicata purposes. . . . The trial court . . . held as much, concluding that the plaintiffs are in privity with the other lot owners with regards to their implied easement, express easement, and covenant appurtenant claims but not their prescriptive easement . . . claims." (Citations omitted.) Id., 167. The Supreme Court further noted that "each lot owner's [prescriptive easement] claim is factually distinct and based on their individual uses of the lawn. Because some lot owners may be able to satisfy the elements of a prescriptive easement claim and others may not, depending on each lot owner's use of the lawn over a fifteen year period, all of the lot owners in the subdivision cannot be said to share the same prescriptive rights. Although the lot owners in the previous cases could litigate their *own* prescriptive easement claims, they could not be expected to know the details of and adequately litigate the plaintiffs' claims, such that the application of res judicata to them would not be unfair." (Emphasis in original.) Id., 168.

The present case, by contrast, does not involve any prescriptive easement claim. Here, the plaintiffs seek vindication of their legal rights as members of the general public to free and unimpeded access and use of Miami Beach. Those rights are not factually distinct, do not accompany passage of title, and do not depend on an individual litigant's use of the individual's own property. *Wheeler*, therefore, is inapposite.

[24] At its essence, the right of the general public set forth in those conveyance instruments constitutes a servitude on the Miami Beach property. See *Grovenburg* v. *Rustle Meadow Associates, LLC*, 174 Conn. App. 18, 25 n.7, 165 A.3d 193 (2017) (servitude is legal device that creates right or obligation that runs with land); 2 Restatement (Third), Property, Servitudes c. 7, introductory note, p. 334 (2000) ("[t]he distinctive character of a servitude is its binding effect for and against successors in interest in the property to which the servitude pertains").

[25] By its plain terms, the 1953 judgment enjoined the defendant "from interfering with the rights of the plaintiffs and the unorganized public to free entry and egress, and to free and unimpeded use and enjoyment of [Miami Beach] along its entire length and width, *from now henceforth* . . . ." (Emphasis added.)

[26] As the court found in its memorandum of decision, "[i]n the intervening years from 1953 to 2017, the general public had free and open access to Miami Beach" and "regularly used the beach for recreation and leisure." In its principal appellate brief, the defendant likewise acknowledges that "[t]he public used [Miami Beach] for decades . . . ."